## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.  _____

COMMODITY FUTURES TRADING COMMISSION,

                         Plaintiff,

v.

VENTURE CAPITAL INVESTMENTS LTD.,
 a Colorado limited liability company,

and

BREONNA S. CLARK a/k/a Eliot Clark
a/k/a Alexander Pak individually, and
d/b/a Venture Capital Investments and
The Life Group,

                         Defendants.

_____

## COMPLAINT FOR INJUNCTIVE RELIEF, RESTITUTION, CIVIL MONETARY PENALTIES AND OTHER EQUITABLE RELIEF UNDER THE COMMODITY EXCHANGE ACT

_____

Plaintiff, Commodity Futures Trading Commission ("Commission" or "CFTC") by and through its attorneys, alleges as follows:

### I.     SUMMARY

1.       From at least March 1, 2018 through at least June 30, 2019 ("Relevant Period"), Venture Capital Investments Ltd. ("VCI"), by and through its principal, Breonna S. Clark a/k/a Eliot Clark a/k/a Alexander Pak, and d/b/a Venture Capital Investment and The Life Group, ("Clark") (collectively "Defendants") and others and Clark directly, fraudulently solicited and received at least $534,829 from at least seventy-two individuals ("pool participants").

Defendants solicited and received these funds in connection with pooled investments in retail foreign currency contracts ("forex"), Bitcoin, and other virtual or cryptocurrencies ("Altcoins"). Rather than use all of pool participants' funds to trade on behalf of the pool, Defendants traded only a small portion and instead misappropriated over $400,000 of pool participants' funds to pay for personal expenses and to make Ponzi-type payments to other pool participants.  To conceal their misappropriation and trading losses, Defendants issued false account statements to pool participants that inflated and misrepresented the value of the pool participants' investments in the pool and the pool's trading returns.

2.      At various times during the Relevant Period, several pool participants requested to withdraw funds from their accounts.  In some instances, Clark failed to respond at all to a pool participant's request.  In other instances, Clark responded with false excuses.  Among the false excuses Clark made to pool participants why Defendants could not comply was that the CFTC was conducting an "audit."  Clark has not returned funds to a number of pool participants despite their requests for withdrawals.

3.      Furthermore, at no time during the Relevant Period was VCI or Clark registered with the CFTC as a commodity pool operator ("CPO") nor was Clark registered as a commodity trading advisor ("CTA").

4.      Most, if not all, of the pool participants were not eligible contract participants ("ECPs") pursuant to Section 1a(18)(A)(xi) of the Commodity Exchange Act ("Act"), 7 U.S.C. §1a(18)(A)(xi) (2018).

5.       By this conduct, and the conduct further described herein, Defendants engaged, are engaging in, and/or are about to engage in acts and practices in violation of  Sections

4*o*(1)(A) and (B), 4m(1), and 6(c)(1) of the Act 7, U.S.C. §§ 6o(1)(A), (B), 6m(1), 9(1) (2018); and CFTC Regulations ("Regulation[s]") 5.3(a)(2) and (3) and 180.1(a), 17 C.F.R. §§ 5.3(a)(2), (3), 180.1(a) (2019).

6.      Unless restrained and enjoined by this Court, Defendants will likely continue to engage in the acts and practices alleged in this Complaint, or in similar illegal acts and practices, as described more fully below.

7.      Accordingly, pursuant to Sections 6c(a) and 2(c)(2)(C)(vii) of the Act, 7 U.S.C. §§ 13a-1, 2(c)(2)(C)(vii) (2018), the CFTC brings this action to enjoin Defendants' unlawful acts and practices, to compel their compliance with the Act and Regulations, and to enjoin them from engaging in any commodity-related activity.  In addition, the Commission seeks civil monetary penalties, restitution and remedial ancillary relief, including, but not limited to, trading and registration bans, disgorgement, pre- and post-judgment interest, rescission, and such other and further relief as the Court may deem necessary and appropriate.

## II.    <u>JURISDICTION AND VENUE</u>

8.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (2018) (codifying federal question jurisdiction) and 28 U.S.C. § 1345 (2018) (providing that U.S. district courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by Act of Congress).  In addition, Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a) (2018), authorizes the CFTC to seek injunctive relief against any person whenever it shall appear that such person has engaged, is engaging, or is about to engage in an act or practice constituting a violation of any provision of the Act or any rule, regulation, or order thereunder.  Section

2(c)(2)(C)(vii) of the Act, 7 U.S.C. § 2(c)(2)(C)(vii) (2018), provides the CFTC with jurisdiction over the forex solicitations and transactions at issue in this action.

9.      Venue properly lies with this Court pursuant to 7 U.S.C. § 13a-1(e) (2018) because Defendants reside in this District, transacted business in this District, and certain acts and practices in violation of the Act occurred, are occurring, or are about to occur, within this District, among other places.

### III.      PARTIES

10.      Plaintiff **Commodity Futures Trading Commission** is an independent federal regulatory agency charged by Congress with the administration and enforcement of the Act, 7 U.S.C. §§ 1-26 (2018), and the Regulations promulgated thereunder, 17 C.F.R. §§1.1-190.10 (2019).  The CFTC maintains its principal office at Three Lafayette Centre, 1155 21st Street N.W., Washington, DC  20581.

11.      Defendant **Venture Capital Investments Ltd.** was a business organized under the laws of Colorado and registered as a limited liability company as of April 3, 2018 with its principal place of business in Denver, Colorado.  Clark was VCI's principal and manager.  VCI was dissolved on October 17, 2018.  VCI has never been registered with the Commission in any capacity.

12.      Defendant **Breonna S. Clark**, a/k/a Eliot Clark, a/k/a/ Alexander Pak, d/b/a Venture Capital Investments and The Life Group, currently resides in the Denver, Colorado area.  From at least March 1, 2018 to April 2, 2018, Clark solely controlled, operated and did business as Venture Capital Investments.  Subsequently, on April 3, 2018, Clark organized VCI as a limited liability company under the laws of Colorado.  On October 17, 2018, Clark

dissolved VCI.  After VCI's dissolution, Clark operated and continued to do business as The Life Group.  Clark has never been registered with the Commission in any capacity.

## IV.   BACKGROUND

13.     A "commodity pool" is defined in Section 1a(10) of the Act, 7 U.S.C. § 1a(10) (2018) as any investment trust, syndicate or similar form of enterprise operated for the purpose of trading commodity interests.

14.     A "commodity pool operator" is defined in Section 1a(11) of the Act, 7 U.S.C. § 1a(11) (2018), as any person engaged in a business that is of the nature of a commodity pool, investment trust, syndicate, or similar form of enterprise, and who, in connection therewith, solicits, accepts, or receives from others, funds, securities or property, either directly or through capital contributions, the sale of stock or other forms or securities or otherwise, for the purpose of trading in commodity interests.

15.     A "commodity trading advisor" is defined in Section 1a(12) of the Act, 7 U.S.C. § 1a(12) (2018) as any person who for compensation or profit, engages in the business of advising others, either directly or through publications, writings or electronic media, as to the value or advisability of trading, among other things, forex, as well as any person who for compensation and profit, and as part of a regular business, issues or promulgates analyses or reports concerning the value of or the advisability of trading in forex.

16.     In the case of an individual, Section 1a(18) of the Act, 7 U.S.C. § 1a(18) (2018), in part, defines an ECP to mean "acting for its own account—(xi) an individual who has amounts invested on a discretionary basis, the aggregate of which is in excess of—(I) $10,000,000; or (II) $5,000,000 and who enters into the agreement, contract, or transaction in order to manage the

risk associated with an asset owned or liability incurred, or reasonably likely to be owned or incurred, by the individual."

17.     Section 2(c)(2)(C)(vii) of the Act, 7 U.S.C. § 2(c)(2)(C)(vii)(2018) provides that the CFTC shall have jurisdiction over an account or pooled investment vehicle that is offered for the purpose of trading, or that trades, any agreement, contract, or transaction in foreign currency described in clause 2(c)(2)(C)(i).  7 U.S.C. § 2(c)(2)(C)(i)(I)(2018), in relevant part, applies to, any agreement, contract or transactions in foreign currency that is offered to, or entered into with, a person that is not an ECP, unless the counterparty, or the person offering to the counterparty, of the person is one of the enumerated exceptions not applicable here.

## V.   FACTS

### A.  Background

18.     During the Relevant Period, Clark organized a commodity pool under the name Venture Capital Investments Pool ("VCI pool").   Pool participants sent money to the VCI pool to be deposited into the VCI pool account for the purpose of trading forex, Bitcoin and Altcoins.

19.     From March 1, 2018 until April 2, 2018, Clark was the CPO for the VCI Pool.

20.     On April 3, 2018, Clark registered VCI as a Colorado limited liability company From April 3, 2018 until October 17, 2018, VCI was the CPO for the VCI pool.

21.     On October 17, 2018, Clark dissolved VCI as a limited liability company.  From that date until the end of the Relevant Period, Clark once again was the CPO for the VCI pool.

22.     During the periods described above, Clark and VCI acted, respectively, as the CPO for the VCI Pool in that they operated the VCI Pool for the purpose of soliciting pool participants, accepting pool participant funds and trading on behalf of pool participants.

23.    At all times during the Relevant Period, Clark was the CTA for the VCI Pool in that, for compensation or profit, Clark advised others as to the value or advisability of trading pool participant funds.  Clark exercised discretionary trading authority in connection with retail forex pool accounts for or on behalf of persons who were not ECPs.

**B.  Defendants' Fraudulent Scheme**

24.    During the Relevant Period, Defendants' fraudulently solicited at least seventy-two pool participants to trade forex, Bitcoin or Altcoins in a commodity pool operated at various points by Clark or VCI.  These solicitations occurred through social media (e.g., Facebook and Twitter), electronic mail, webinars, instant messaging and face-to-face meetings touted as "financial seminars" that were held in churches or in the home of one of the pool participants. As a result of these solicitations, pool participants sent Defendants over $534,829.  Rather than trade all pool participant funds, Defendants misappropriated at least $450,302 which were used for Ponzi-type payments and personal expenses.  In order to conceal their misappropriation, Defendants issued false statements, lied to pool participants about the availability of their funds and masked their misappropriation by making Ponzi-type payments.

**1.    Defendants Made Fraudulent Solicitations**

25.    During the course of the solicitations Defendants told prospective pool participants that Defendants had trading experience and expertise, had an excellent track record, and promised future profitability trading forex and virtual currencies.  For example, in:

a.    an October 1, 2018 electronic mail sent to prospective pool
participants, Defendants claimed that they had a "master team

      of traders [able to] execute the Foreign Exchange markets with precision and accuracy."

b.   an April 12, 2018 Facebook posting, Defendants stated "[t]he average IRA and 401k yield a 12-19% return a year.  With Investing in Venture you could yield 12-16% per month."

c.   a May 26, 2018 Facebook posting, Defendants stated "[o]ur Forex Fiat trading has secure (sic) 21% this month".

d.   a June 28, 2018 VCI's Facebook page posting Defendants stated that: "We have closed the month of June with a 19% return to our clients!!!"

e.   an April 16, 2018 VCI Twitter account posting, Defendants stated "[w]e specialize in trading your capital like the Banks and Large Institutions that only pay you a return .1% - 1.5% on average in your savings account. We return our clients on average 12-21% monthly."

f.   an April 16, 2018 instant message to a prospective pool participant, Defendants stated that "[t]his is a Forex Fund investment that pays a 12-21% monthly ROI. We also have crypto investments which return 18% weekly."

g.   an April 14, 2018 VCI Twitter posting, Defendants stated that they have "revolutionized the art of Forex trading" and specialized in "innovative calculated trading and risk

             management to give our clients the largest return on their

             capital."

26.     All of Defendants' statements set out in paragraph 25 are false.

27.     In fact, Defendants did not possess trading experience and expertise, have an excellent track record, and their promises of future profitability were fraudulent.

28.     Defendants' statements that they had trading experience and expertise is contradicted by the fact that, upon information and belief, Clark, as CTA for the VCI pool: 1) had very little trading experience; and 2) lost what little money Clark traded on behalf of the pool participants.

29.     In addition, upon information and belief, one of the "master traders" touted by Clark as "highly skilled and trained" was a truck driver who provided administrative assistance to VCI.

30.     Further, Clark did not have an excellent track record trading.  In fact, Clark's claims of, among other things:  1) 12-16% monthly returns; 2) that VCI's Forex Fiat trading secured 21% monthly; and 3) that VCI returned on average 12-21% monthly are simply false. What little trading Clark engaged in was unprofitable and Defendants misappropriated the bulk of pool participant funds.

31.     Defendants' claims of future profitability are also false for the same reasons as identified in paragraphs 28 and 30.

32.     Defendants also made misrepresentations regarding the risk of loss involved with trading forex, Bitcoin and Altcoins.  For example, Defendants represented:

a.   in an April 17, 2018 electronic mail, Clark circulated a

PowerPoint Presentation to prospective pool participants

promising that pool participants received a "capital lock" which

protected pool participants' principal capital from any risk of

loss.

b.   in an October 1, 2018 circular to prospective pool participants,

that they had implemented "stringent trading plans . . . to

safeguard all investor capital to ensure minimal loss."

33.     Defendants' statements in paragraph 32 were false.  Defendants did not have a

"capital lock" nor did they have "stringent trading plans. . . to safeguard all investor capital to

ensure minimal loss." Rather than safeguard pool participant funds, Defendants misappropriated

the bulk of their funds.

34.     In soliciting pool participants, Defendants made no attempt to determine if they

were ECPs under 7 U.S.C. §1a(18)(A)(xi) (2018).  In fact, most, if not all, of Defendants' pool

participants were not ECPs.

**2.     Defendants Misappropriated Pool Participant Funds**

35.     During the Relevant Period, Defendants instructed pool participants to send their

funds directly to VCI's bank accounts at J.P. Morgan Chase Bank N.A. and US Bank N.A.

Defendants also instructed pool participants to send funds through service providers such as

PayPal, Zelle, Venmo, Cash App and a Bitcoin wallet.

36.     During the Relevant Period, Defendants received at least $534,829 in pool

participant funds.  Of this amount, Defendants transferred approximately $121,165 to various

cryptocurrency and forex trading accounts in the name of Breonna Clark at cryptocurrency and forex exchanges. Of this amount, approximately $37,282 was returned from cryptocurrency and forex trading accounts to VCI and/or Clark bank accounts. Upon information and belief, the remaining approximately $83,883 was lost trading. Defendants spent $644 for business expenses.

37.     Defendants used the remaining pool participants' funds, at least $450,302, to pay for Clark's personal expenses, including the purchase or lease of a BMW 5 series automobile, the purchase of jewelry, gas, groceries, cash withdrawals totaling over $93,000, and to make Ponzi-type payments to pool participants to create the illusion of profitability.

### 3.     Defendants Concealed Their Misappropriation

38.     To conceal their misappropriation, Defendants sent pool participants account statements which purported to show trading gains. The account statements were a sham. For example, one pool participant received a November 1, 2018 statement showing more than a 67% return over a 14 week period. Another pool participant received a May 25, 2018 account statement showing a 26% return for the month. These statements were false as little of the pool participants' funds were used to trade and what trading was done, upon information and belief, was unprofitable.

39.     Defendants concealed their misappropriation by making Ponzi-type payments to pool participants. These payments purportedly represented profits that Defendants made on behalf of pool participants.

40.     At other times during the Relevant Period, pool participants sought to withdraw their funds. In several of these instances, Clark ceased communicating with these pool

participants and blocked these pool participants on social media, including VCI's Facebook page.

41.     Clark also told pool participants that a "CFTC audit" was a reason he could not return pool participants' funds.  In fact, Clark's statement that Defendants were subject to a CFTC "audit" was false.  No such CFTC "audit" ever occurred.  Defendants never returned funds to most of those pool participants who requested their money back.

**C.     Clark Was a Controlling Person of Venture Capital Investment Ltd.**

42.     At all times, Clark was a controlling person of VCI.  Clark founded and organized VCI, acted as its principal and manager, and was in charge of marketing and pool participant relations.  Clark either directly or indirectly controlled content for the VCI Facebook page and Twitter account, opened bank accounts and was the signatory on such bank accounts and controlled the Bitcoin wallet address to which pool participants were directed to deposit Bitcoin.  Clark was in charge of hiring employees and contractors for VCI.  Clark acted in bad faith or knowingly induced VCI's fraudulent acts.

**VI.     VIOLATIONS OF THE COMMODITY EXCHANGE ACT AND REGULATIONS**

**COUNT ONE**

**FRAUD BY A COMMODITY POOL OPERATOR
AND
COMMODITY TRADING ADVISOR**

**Violations of Section 4$o$(1) of the Act, 7 U.S.C. § 6$o$(1) (2018)**

43.     The allegations contained in paragraphs 1 through 42 are realleged and incorporated herein by reference.

44.     Section 1a(11) of the Act, 7 U.S.C. § 1a(11) (2018), defines a "commodity pool operator" as any person engaged in a business that is of the nature of a commodity pool, investment trust, syndicate, or similar form of enterprise, and who, in connection therewith, solicits, accepts, or receives from others, funds, securities or property, either directly or through capital contributions, the sale of stock or other forms or securities or otherwise, for the purpose of trading in commodity interests.

45.     17 C.F.R. § 5.1(d)(1) (2019) defines a CPO for purposes of 17 C.F.R. part 5, as "any person who operates or solicits funds, securities, or property for a pooled investment vehicle that is not an ECP as defined in section 1a(18) of the Act, and that engages in retail forex transactions."

46.     During the period from at least March 1, 2018 to April 2, 2018 and October 17, 2018 to June 30, 2019, Clark acted as a CPO for the VCI pool.  Further, from April 3, 2018 to October 17, 2018, VCI acted as a CPO for the VCI pool.  During these time frames, Clark and VCI acted as CPOs because they solicited and accepted funds for a pooled investment vehicle from non-ECPs for the purpose of engaging in trading retail forex.

47.     Section 1a(12) of the Act, 7 U.S.C. § 1a(12) (2018), in part, defines a "commodity trading advisor" as any person who for compensation or profit, engages in the business of advising others, either directly or through publications, writings or electronic media, as to the value or advisability of trading forex as well as any person who for compensation and profit, and as part of a regular business, issues or promulgates analyses or reports concerning the value of or the advisability of, among other things, trading forex.

48.     Under 17 C.F.R. §5.1(e)(1) (2019), a CTA for purposes of 17 C.F.R. part 5 means, in relevant part, any person who exercises discretionary trading authority or obtains written authorization to exercise discretionary trading authority over any account for or on behalf of any person that is not an ECP in connection with retail forex transactions.

49.     Clark acted as a CTA because for compensation or profit, Clark advised pool participants on trading retail forex.  In addition, Clark acted as a CTA because Clark exercised discretionary trading authority or obtained written authorization to exercise discretionary trading authority over pool accounts for or on behalf of persons who were not ECPs in connection with retail forex transactions.

50.     Sections 4$o$(1)(A) and (B) of the Act, 7 U.S.C. § 6$o$(1)(A) and (B) (2018), in relevant part, makes it unlawful for CPOs and CTAs, whether registered with the Commission or not, by use of the mails or any other means of interstate commerce, directly or indirectly, to:  (A) employ and device, scheme or artifice to defraud any client or pool participant, or (B) engage in any transaction, practice, or course of business that operates as a fraud or deceit upon any client or pool participant.

51.     Section 2(c)(2)(C)(ii)(I) of the Act, 7 U.S.C. § 2(c)(2)(C)(ii)(I) (2018), provides in relevant part, that an account or pooled investment vehicle that is offered for the purpose of trading, or that trades, any agreement, contract, or transaction in foreign currency described in clause 2(c)(2)(C)(i) shall be subject to Section 4$o$ of the Act.

52.     VCI and Clark directly violated 7 U.S.C. § 6$o$(1)(A)-(B)(2018) while acting as CPOs because they, among other things, intentionally or recklessly:  (1) misappropriated pool participant funds; (ii) made material misrepresentations about Defendants' trading expertise,

track record, profitability, and minimized the risk of loss; and (3) created and distributed to pool participants fabricated account statements.

53.     Clark directly violated 7 U.S.C. § 6*o*(1)(A)-(B)(2018) while acting in his capacity as a CTA, because he, among other things, intentionally or recklessly:  (1) misappropriated pool participant funds; (ii) made material misrepresentations about Defendants' trading expertise, track record, profitability, and minimized the risk of loss; and (3) created and distributed to pool participants fabricated account statements.

54.     Each act of misappropriation, misrepresentation of material fact, and issuance of a false report, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of 7 U.S.C. § 6*o*(1)(A) and/or (B)(2018).

55.     Clark held and exercised direct and indirect control over VCI and either did not act in good faith or knowingly induced VCI's violations and is therefore liable, pursuant to 7 U.S.C. § 13c(b)(2018), for VCI's violations of 7 U.S.C. § 6*o*(1)(A) and/or (B)(2018).

56.     The foregoing acts, omissions, and failures by Clark and other officers, employees, and agents of VCI occurred within the course or scope of their employment or office with VCI.  Pursuant to 7 U.S.C. § 2(a)(1)(B)(2018) and 17 C.F.R. 1.2 (2019), VCI is liable as a principal for its officers, employees, and agents' acts, omissions, and failures, including but not limited to Clark, in violation of 7 U.S.C. § 6*o*(1)(A) and/or (B)(2018).

**COUNT TWO**

**FRAUD BY DECEPTIVE DEVICE OR CONTRIVANCE**

**Violations of 6(c)(1) of the Act, 7 U.S.C. § 9(1) (2018) and17 C.F.R. § 180.1(a) (2019)**

57.     The allegations contained paragraphs 1 through 56 are realleged and incorporated herein by reference.

58.     Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), makes it unlawful for any person, directly or indirectly, to:

> use or employ, or attempt to use or employ, in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the Commission shall promulgate by not later than 1 year after [July 21, 2010, the date of enactment of the Dodd-Frank Wall Street Reform and Consumer Protection Act] . . . .

59.     17 C.F.R. § 180.1(a) provides:

> It shall be unlawful for any person, directly or indirectly, in connection with any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, to intentionally or recklessly:
>
> > (1)     Use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud;
> >
> > (2)     Make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading;
> >
> > (3)     Engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person . . . .

Page 16 of 23

60.     As alleged above, Defendants violated 7 U.S.C. § 9(1)(2018) and 17 C.F.R.

§180.1(a)(2019) in connection with contracts of sale of commodities in interstate commerce by,

among other things:  (1) misappropriated pool participant funds; (ii) made material

misrepresentations about Defendants' trading expertise, track record, profitability, and

minimized the risk of loss; and (3) created and distributed to pool participants fabricated account

statements.

61.      Defendants intentionally or recklessly engaged in the acts and practices alleged

above.

62.     Each act of misappropriation, misrepresentation of material fact, and issuance of a

false report, including but not limited to those specifically alleged herein, is alleged as a separate

and distinct violation of 7 U.S.C. § 9(1)(2018) and 17 C.F.R. §180.1(a)(2019).

63.     Clark held and exercised direct and indirect control over VCI and either did not

act in good faith or knowingly induced VCI's violations and is therefore liable, pursuant to

7 U.S.C. § 13c(b) (2018), for VCI's violations of 7 U.S.C. § 9(1)(2018) and 17 C.F.R.

§180.1(a)(2019).

64.     The  foregoing  acts,  omissions,  and  failures  by  Clark  and  other  officers,

employees, and agents of VCI occurred within the course or scope of their employment or office

with VCI.  Pursuant to 7 U.S.C. § 2(a)(1)(B) (2018) and  17 C.F.R. 1.2 (2019), VCI is liable as a

principal for its officers, employees, and agents' acts, omissions, and failures, including but not

limited to Clark, in violation of 7 U.S.C. § 9(1)(2018) and 17 C.F.R. §180.1(a)(2019).

## COUNT THREE

## FAILURE TO REGISTER AS A CPO

**Violations of Section 4m(1) of the Act, 7 U.S.C. § 6m(1) (2018) and 17 C.F.R. § 5.3(a)(2)(i) (2019)**

65.     The allegations in contained in paragraphs 1 through 64 are realleged and incorporated herein by reference.

66.     With certain specified exceptions and exemptions not applicable here, Section 4m(1) of the Act, 7 U.S.C. § 6m(1)(2018), makes it unlawful for any CPO to make use of the mails or any means or instrumentality of interstate commerce in connection with its business unless it is registered with the CFTC.

67.     Similarly, 17 C.F.R. § 5.3(a)(2)(i) (2019) makes it unlawful for any CPO engaged in retail forex transactions defined in 17 C.F.R. § 5.1(d)(1) (2019), to act as a CPO without being so registered. 17 C.F.R. § 5.1(d)(1) defines a CPO as "any person who operates or solicits funds, securities, or property for a pooled investment vehicle that is not an ECP as defined in section 1a(18) of the Act, and that engages in retail forex transactions."

68.     During the period from at least March 1, 2018 to April 2, 2018 and October 17, 2018 to June 30, 2019, Clark acted as a CPO.  Further, from April 3, 2018 to October 17, 2018, VCI acted as a CPO.  During these time frames Clark and VCI solicited and accepted funds for a pooled investment vehicle from non-ECPs for the purpose of engaging in retail forex transactions.

69.     VCI and Clark violated 7 U.S.C. § 6m(1)(2018) and 17 C.F.R. § 5.3(a)(2)(i)(2019) by engaging in these activities without having registered as CPOs.

70.     Clark held and exercised direct and indirect control over VCI and either did not act in good faith or knowingly induced VCI's violations and is therefore liable, pursuant to 7 U.S.C. § 13c(b)(2018) of the Act, for VCI's violations of 7 U.S.C. § 6m(1)(2018).

71.     Each use by VCI and Clark of the mails or any means or instrumentality of interstate commerce in connection with their business as a CPO without proper registration, including, but not limited to, those specifically alleged herein, is alleged as a separate and distinct violation of 7 U.S.C. § 6m(1)(2018).

## COUNT FOUR

## FAILURE TO REGISTER AS A CTA

### Violations of Section 4m(1) of the Act, 7 U.S.C. § 6m(1) (2018) and 17 C.F.R. § 5.3(a)(3)(i) (2019)

72.     The allegations contained in paragraphs 1 through 71 are realleged and incorporated herein by reference.

73.     With certain specified exceptions and exemptions not applicable here, Section 4m(1) of the Act, 7 U.S.C. § 6m(1)(2018), makes it unlawful for any CTA to make use of the mails or any means or instrumentality of interstate commerce in connection with its business unless it is registered with the CFTC.  Similarly, 17 C.F.R. § 5.3(a)(3)(i)(2019) makes it unlawful for any CTA engaged in retail forex transactions to act as a CTA without being registered.

74.     Pursuant to 17 C.F.R. § 5.1(e)(1) (2019), a CTA, in relevant part, means any person who exercises discretionary trading authority or obtains written authorization to exercise

discretionary trading authority over any account for or on behalf of any person that is not an ECP in connection with retail forex transactions.

75.     As set forth above, Clark acted as a CTA because for compensation or profit, Clark advised pool participants who were not ECPs on trading retail forex.  In addition, Clark acted as a CTA because Clark exercised discretionary trading authority or obtained written authorization to exercise discretionary trading authority over pool accounts for or on behalf of persons who were not ECPs in connection with retail forex transactions.

76.     As set forth above, Clark used the mails or other means or instrumentalities of interstate commerce in connection with the VCI pool's business.

77.     Clark violated 7 U.S.C. § 6m(1)(2018) and 17 C.F.R. § 5.3(a)(3)(i)(2019) by engaging in these activities without having registered as a CTA.

78.     Each use by Clark of the mails or any means or instrumentality of interstate commerce for the in purpose of trading in commodity interests and, in connection therewith, solicited, accepted, or received funds, either directly or otherwise, for the purpose of trading in commodity interests, including, but not limited to, those specifically alleged herein, is alleged as a separate and distinct violation of 7 U.S.C. § 6m(1)(2018).

## VII.   RELIEF REQUESTED

WHEREFORE, the Commission respectfully requests that this Court, as authorized by 7 U.S.C. § 13a-1 (2018), and pursuant to the Court's inherent equitable powers, enter:

A.     an order finding Clark and VCI liable for violating 7 U.S.C. §§ 6o(1)(A) and (B), 6m(1) and 9(1) (2018); and 17 C.F.R. §§ 5.3(a)(2), (3) and 180.1(a) (2019).

B.      an order of permanent injunction restraining and enjoining Clark, VCI and their affiliates, agents, servants, employees, successors, assigns, attorneys, and all persons in active concert with them, who receive actual notice of such order by personal service or otherwise, from engaging in the conduct described above, in violation of 7 U.S.C. §§ 6$o$(1)(A) and (B), 6m(1) and 9(1)(2018); and 17 C.F.R. §§ 5.3(a)(2), (3) and 180.1(a)(2019);

C.      an order of permanent injunction restraining and enjoining Clark, VCI and their affiliates, agents, servants, employees, successors, assigns, attorneys, and all persons in active concert with them, from directly or indirectly:

      i.      trading on or subject to the rules of any registered entity (as that term is defined in 7 U.S.C. § la(40) (2018));

      ii.      entering into any transactions involving "commodity interests" (as that term is defined in 17 C.F.R. § 1.3 (2019) for accounts held in the name of Clark or VCI or for accounts in which Clark or VCI has a direct or indirect interest;

      iii.      having any commodity interests traded on VCI's or Clark's behalf;

      iv.      controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests;

      v.      soliciting, receiving or accepting any funds from any person for the purpose of purchasing or selling any commodity interests;

      vi.      applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring registration or exemption from registration with the Commission, except as provided for in 17 C.F.R. § 4.14(a)(9) (2019);

      vii.        acting as a principal (as that term is defined in 17 C.F.R. § 3.1(a) (2019)), agent, or any other officer or employee of any person registered, exempted from registration, or required to be registered with the Commission, except as provided for in 17 C.F.R. § 4.14(a)(9) (2019);

      D.      an order directing Clark and VCI, as well as any third-party transferee and/or successors thereof, to disgorge, pursuant to such procedure as the Court may order, all benefits received including, but not limited to, salaries, commissions, loans, fees, revenues, and trading profits derived, directly or indirectly, from acts or practices which constitute violations of the Act and Regulations as described herein, including pre-judgment and post-judgment interest;

      E.      an order directing Clark and VCI, as well as any successors thereof, to make full restitution to every person who has sustained losses proximately caused by the violations described herein, including pre-judgment and post-judgment interest;

      F.      an order directing Clark and VCI, as well as any successors thereof, to rescind, pursuant to such procedures as the Court may order, all contracts and agreements, whether implied or express, entered into between, with or among Clark and VCI and any of the pool participants whose funds were received by Clark and VCI as a result of the acts and practices that constituted violations of the Act and Regulations as described herein;

      G.      an order directing Clark and VCI to pay a civil monetary penalty assessed by the Court, in an amount not to exceed the penalty prescribed by 7 U.S.C. § 13a-1(d)(1) (2018), as adjusted for inflation pursuant to the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Pub. L. 114-74, tit. VII, § 701, 129 Stat. 584, 599-600, *see* 17 C.F.R. § 143.8 (2019), for each violation of the Act and Regulations, as described herein;

    H.      an order requiring Clark and VCI to pay costs and fees as permitted by 28 U.S.C.

§§ 1920 and 2413(a)(2) (2018); and

    I.      an order providing such other and further relief as this Court may deem necessary

and appropriate under the circumstances.

February 14, 2020                      Respectfully Submitted,

*/s/ Kim G. Bruno*
Kim G. Bruno
D.C. Bar No. 389899
Senior Trial Attorney

Michael Solinsky
D.C. Bar No. 433754
Chief Trial Attorney

Commodity Futures Trading Commission
Division of Enforcement
Three Lafayette Centre
1155 21st Street NW
Washington, DC 20581
Telephone: (202) 418-5000
Facsimile: (202) 418-5538
Email:kbruno@cftc.gov; msolinsky@cftc.gov

Attorneys for the Commodity Futures Trading
Commission

Page 23 of 23